IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DAVID PAUL AUBIN, | CASE NO. 1:20-CV-02206-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

### INTRODUCTION

Plaintiff David Paul Aubin filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying benefits in Mr. Aubin's applications for child's insurance benefits dated October 11, 2017 and adult supplemental security income ("SSI") benefits dated April 30, 2018. (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On April 8, 2021, the parties consented to the Magistrate Judge's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (ECF #13). On May 21, 2021, pursuant to General Order 2021-06 and Local Rule 72.2,this case was reassigned to me. (Non-document entry of May 21, 2021).

After careful review, and for the reasons that follow, I **AFFIRM** in part and **REVERSE** in part the decision of the Commissioner and **REMAND** this matter for further proceedings consistent with this opinion.

### PROCEDURAL BACKGROUND

Mr. Aubin filed an application for child's disability benefits on October 11, 2017 and for adult SSI benefits on April 30, 2018, both alleging a disability onset date of October 23, 1993 (his date of birth). (Tr. 64-65, 94-95). The claims were denied initially and on reconsideration. (Tr. 64-110). Mr. Aubin then requested a hearing before an Administrative Law Judge. (Tr. 132-33).

On June 27, 2019, Mr. Aubin (represented by counsel) and a vocational expert ("VE") appeared and testified at a hearing before the ALJ. (Tr. 35-63). In a written decision dated July 18, 2019, the ALJ found Mr. Aubin not disabled. (Tr. 12-34). The Appeals Council denied Mr. Aubin's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see also* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Aubin timely filed this action on September 30, 2020. (ECF #1).

### FACTUAL BACKGROUND

### I.   ADMINISTRATIVE HEARING

Mr. Aubin (represented by counsel) and VE Thomas Nimberger appeared at a hearing before the ALJ on June 27, 2019. (Tr. 35-63).

Mr. Aubin testified he works part-time in maintenance at Walmart. (Tr. 38-39). He works 22.5 to 27.5 hours per week and makes $11.22 per hour. (Tr. 52). His duties are to sweep the floors and clean the bathrooms, and to clean the floors when there is a spill. (Tr. 39). Mr. Aubin testified he finds the work "hard" when there are a lot of customers and when he has a lot of

demands from his manager. (Tr. 40). Mr. Aubin receives extra assistance from his employer. (Tr. 44-45). He testified he "do[es]n't really see the whole picture of cleaning" and must do his work over again. (Tr. 45). He does not "do as much logic as other employees would do." (*Id.*). He explained this as "I only see, like, the outer part, but sometimes I miss the inner part." (Tr. 45-46).

Mr. Aubin testified he could not handle the demands of a full-time job, particularly one as strenuous as his maintenance job. (Tr. 50). In response to the ALJ's questioning, Mr. Aubin answered that he probably could complete a less physically demanding job, such as one "sitting in an office" as suggested by the ALJ. (*Id.*). On examination by his counsel, Mr. Aubin stated that he has issues paying attention (despite taking his ADHD medication), he will miss parts when cleaning, and would likely also miss details in an office job. (Tr. 51). Mr. Aubin testified he could show up 40 hours per week, but that he would not be able to "do the job right for 40 hours." (*Id.*).

Mr. Aubin testified he is working to complete his Associate of Arts degree at Lakeland Community College. (Tr. 40). He has been taking classes for seven years, but still has not completed the coursework to graduate. (Tr. 49). He initially received C's and F's in his courses, but after his third year, he "started to really understand what it is to be a college student." (Tr. 46). He was unaware of his grade point average; but after additional questioning by the ALJ, testified that it was "maybe 2.5 to 2.8." (Tr. 46-47). He sometimes receives assistance, such as a reader or additional time to complete exams. (Tr. 47-48). Mr. Aubin testified he didn't always inform the school that he required extra time; on these occasions, his grades suffered. (*Id.*).

Mr. Aubin does not have a driver's license, but he does hold a driver's permit. (Tr. 40-41). He has had the permit for about two years prior to the hearing, but testified that he has not been able to achieve his driver's license yet, stating "I don't really look and don't really see – and I can't

3

really see out of the back of my car," and "I go off the road sometimes . . . when I don't look really closely. I can't see the road straight. My eyes go cockeyed, and I don't really see that well sometimes. I look off to someplace else." (Tr. 41-42). He attributed these vision issues to his cerebral palsy. (Tr. 42). Mr. Aubin has not had an accident or a ticket while driving. (Tr. 41).

Mr. Aubin testified his eye doctor identified issues with his depth perception, indicating amblyopia. (Tr. 42).

Mr. Aubin has received mental health treatment since he was a child. (Tr. 42-43). He currently treats with Drs. Eden and Schenkelberg. (Tr. 43). Mr. Aubin testified these doctors help him for when he has "angry outbursts." (Tr. 44). These outbursts have occurred most frequently at home, but have also occurred at work. (*Id.*).

The ALJ indicated to the VE that Mr. Aubin does not have vocationally relevant work under Ruling 82-62. (Tr. 52). The ALJ directed the VE to consider an individual, 25 years old, close to graduating with an associate degree, who can read, write, and perform arithmetic. (Tr. 53). The individual is limited to sedentary work, with additional limitations to no climbing of ladders, ropes, or scaffolds; no crawling; occasional climbing of ramps and stairs, balancing, stooping, and kneeing; no exposure to hazards such as heights, machinery, and commercial driving; mental limitations such that the individual can perform routine tasks in a low stress environment; no fast pace, strict quotas, or frequent duty changes; involving superficial interpersonal interactions with coworkers and supervisors, specifically, no arbitration, negotiation, or confrontation; and no interaction with the general public as a job requirement. (Tr. 53-54).

The VE responded the individual could perform the following jobs:

- Addresser/house worker (DOT #209.587-010):[1] sedentary, unskilled, SVP[2] 2, 10,000 jobs available nationally;

- Document preparer (DOT #249.587-018): sedentary, unskilled, SVP 2, 14,000 jobs available nationally; and,

- Table worker (DOT #739.687-182): sedentary, unskilled, SVP 2, with 5,000 jobs available nationally.

(Tr. 54-56). VE Nimberger testified he based these job numbers on his experience. (Tr. 55-56). He explained a discrepancy in numbers between Employment Quarterly (20,000 addressers nationally) and Job Browser Pro (5,500 addressers nationally) and provided his opinion as to the national number; he also explained the DOT classifies nearly 800 different table worker positions, and provided a conservative estimate of job numbers for the particular DOT he identified. (*Id.*). The VE testified these jobs would likely be completed at a workstation or a bench, and could be in an office setting but would not be considered an "office job." (Tr. 56).

The VE testified he could not identify other jobs in the DOT such an individual could perform, stating, "[w]hat I'm trying to impress upon the court is this is an extremely limited individual." (Tr. 57-58).

The second hypothetical assumed the same parameters of above, but the individual was limited to off-task behavior twenty percent of the time due to symptoms from medically determinable impairments. (Tr. 57). The VE testified that individual would not be proficient, competitive, or productive enough to perform work. (*Id.*).

---

[1] "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. § 404.1566(d).

[2] "SVP" stands for "Specific Vocational Preparation" and refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

Mr. Aubin's counsel cross-examined the VE. (Tr. 58-61). The VE stated that an individual's ability to maintain employment would be impacted if the individual required additional supervision for redirection or retraining at jobs tasks twice per day, once in the morning, and once in the afternoon, on an ongoing basis. (Tr. 60). Occasional supervision is normal, but an individual requiring daily retraining approaches sheltered work. (*Id.*).[3]

## II.  POST-HEARING EVIDENCE

On July 2, 2019, Mr. Aubin submitted a post-hearing brief, objecting to VE Nimberger's hearing testimony as "surprise testimony" and including rebuttal evidence in the form of a letter from VE Mark Heckman. (Tr. 371-81). VE Heckman explained that the limitation of only superficial interaction with coworkers and supervisors precludes all work, including the jobs VE Nimberger identified (addresser, document preparer, and table worker). (Tr. 373). VE Heckman explained that because training periods require frequent supervision and interaction with supervisors and coworkers, an individual limited to superficial interaction would not survive the training/probationary period in the competitive labor market. (*Id.*).

VE Heckman also disputed the numbers VE Nimberger testified existed in the national economy for each position. (Tr. 374-75). In his review of the addresser position, VE Heckman used Job Browser Pro and U.S. Publishing to find an estimate of 2,528 jobs available nationally; once the limitations from the hypothetical were included, the number of available jobs dropped to

---

[3]     Under the Social Security regulations, employment that is deemed "sheltered work" may not constitute substantial gainful activity "if it can be shown that the claimant is not truly earning the amounts he or she is being paid." *Webb v. Comm'r of Soc. Sec.*, No. 14-12332, 2015 WL 4756589, at *4 (E.D. Mich. Aug. 11, 2015) (citing 20 C.F.R. § 404.1574(a)(3)).

less than 1,000. (Tr. 374-75). For the document preparer position, VE Heckman opined that the limitations included in the hypothetical would reduce the number of available jobs nationally to "far less than 1000." (Tr. 375). VE Heckman also indicated the table worker position had a "top number" of 2,875 according to Job Browser Pro and U.S. Publishing; however, in his opinion, once the additional limitations were included, this number also dropped to "far less than 1000" jobs. (Tr. 375-76).

VE Heckman opined that the data included in the DOT descriptions is 30 to 40 years old; based on updated data from the U.S. Department of Labor, the addresser job is better classified as a "semiskilled" position, SVP 4 or greater, due to the integration of technology. (Tr. 374). Moreover, this position is not a "standalone" job, but is performed as a composite job with other duties. (*Id.*). Similarly, VE Heckman indicated the document preparer and table worker positions were also better classified as semiskilled jobs as actually performed, and also require greater social integration and training, far exceeding the superficial restriction included in the hypothetical. (Tr. 375-76). VE Heckman also opined the table worker position was not sedentary, nor was it consistent with the "low stress" restriction in the hypothetical. (Tr. 376).

## III.    PERSONAL AND VOCATIONAL EVIDENCE

Mr. Aubin alleges his impairments began at birth; he was 25 years old at the time of the administrative hearing. (Tr. 17, 27). Mr. Aubin completed high school with the support of an IEP.

(Tr. 27, 239-320). Mr. Aubin has been employed as a maintenance worker on a part-time basis, but this has not been substantial gainful activity and he has no past relevant work. (Tr. 18, 27).

## IV.    RELEVANT MEDICAL EVIDENCE[4]

**Dr. Levinsohn.** Morris Levinsohn, M.D., was Mr. Aubin's pediatric neurologist and began treating Mr. Aubin at age seven. (Tr. 528-30). In a December 11, 2000 letter, Dr. Levinsohn indicated Mr. Aubin had been evaluated four years prior, and an MRI revealed damage to the white matter of his brain, suggesting a diagnosis of cerebral palsy. (*Id.*). Dr. Levinsohn recounted Mr. Aubin's history, describing some attention deficits and developmental delays. (Tr. 528-29). Mr. Aubin was prescribed Ritalin in May 2000. (Tr. 529).

Dr. Levinsohn's exam in December 2000 indicated Mr. Aubin had an asymmetric gait with toeing to the right side and slight eversion of the right foot; there was also asymmetry in muscle bulk, with the right smaller than the left. (*Id.*). Dr. Levinsohn determined Mr. Aubin had mild hemiparesis from an intrauterine insult, mild attention deficit disorder, and moderately delayed gross motor milestones; he was otherwise "close on a par for his chronological age." (Tr. 530). Dr. Levinsohn maintained Mr. Aubin on an Adderall prescription, and notes from the following years (through 2003) indicated he responded well to this treatment for his ADHD. (Tr. 531-38).

On August 18, 2003, Dr. Levinsohn noted Mr. Aubin displayed symptoms of autism spectrum disorder, namely, difficulty with social interaction, interrupting conversation with off the wall comments, poor eye contact, and unusual preoccupations and obsessions, such as with Bounty paper towels and super lottery times. (Tr. 535-36).

---

[4]    I summarize here the portions of the record relevant to the arguments raised by Mr. Aubin. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief considered waived).

On December 8, 2003, Dr. Levinsohn conducted a neurologic evaluation. (Tr. 537). Dr. Levinsohn diagnosed Mr. Aubin with autism spectrum disorder, based on responses to the Australian Scale for Asperger's Syndrome. (*Id.*). Dr. Levinsohn noted Mr. Aubin had an IEP and speech and occupational therapies in place to assist Mr. Aubin with the symptoms of this diagnosis. (*Id.*). Mr. Aubin was prescribed Adderall and Strattera for his co-occurring ADHD and autism spectrum disorder; he responded well to this treatment. (Tr. 539-62).

Mr. Aubin was fitted with a below-the-knee brace in 2006. (Tr. 549). He also exhibited right hemiparesis and mild hyperreflexia on a June 7, 2006 examination. (*Id.*).

After a December 20, 2006 examination, Dr. Levinsohn indicated Mr. Aubin exhibited ongoing impulsivity and occasional temper outbursts based on results from a Connor's Global Index-Parent version ("CGI-P"). (Tr. 551). Notes indicate Mr. Aubin was in a special education program and was seemingly keeping pace with his peers. (*Id.*). Results from a December 20, 2007 CGI-P indicated an improved overall response, although Mr. Aubin displayed ongoing inattention and distractibility. (Tr. 554). An October 25, 2008 CGI-P indicated a good clinical response, although Dr. Levinsohn also noted Mr. Aubin did not always complete assignments. (Tr. 558). Mr. Aubin was in ninth grade at the time and had an IEP with social skills strategies in place. (*Id.*).

Mr. Aubin underwent a heel cord lengthening procedure in 2008 and was required to wear a cast for several months. (*Id.*).

In April 2010, when Mr. Aubin was 16 years old, Dr. Levinsohn indicated Mr. Aubin "has a rather significant neuropsychiatric profile with a past history of right hemiplegia, mild cognitive disabilities, and features consistent with ADHD." (Tr. 560). CGI-P scores identified inattention, distractibility, and increasing frustration. (*Id.*). These results continued in a September 2010 CGI-P

score; Dr. Levinsohn discontinued Mr. Aubin's Strattera medication in favor of Vyvanse, and requested Mr. Aubin's mother gather observations and data from his schoolteachers to determine its efficacy. (Tr. 563-64).

**Dr. Eden.** Diane Eden, M.D., was Mr. Aubin's psychiatrist. (*See, e.g.*, Tr. 414). Treatment notes from February 11 and July 1, 2016, November 8, 2017, and February 13, April 10 and September 24, 2018 consistently indicate Mr. Aubin exhibited impulsivity and subtle disorganization in thought processes. (Tr. 415-16, 460-61, 476, 501-03, 579). Mr. Aubin also exhibited mild impairment in attention and concentration. (Tr. 460).

Examination notes from April 10, 2018 indicated Mr. Aubin stopped taking his medications; he became defiant at home and got in trouble at work. (Tr. 501).

**Beacon Health.** Richard Schenkelberg, M.D., is a physician at Beacon Health; he treats Mr. Aubin for his diagnoses of cerebral palsy, autism spectrum disorder, ADHD, and anxiety disorder. (Tr. 511, 513). Mr. Aubin also receives mental health treatment from other providers at Beacon Health. (*See, e.g.*, Tr. 591-92, 609-19).

Treatment notes dated March 7, 2019 from Beacon Health providers indicate Mr. Aubin has communication barriers and physical or cognitive limitations; Mr. Aubin reported needing written information to better understand directions. (Tr. 592). Mr. Aubin and his mother reported symptoms including difficulty organizing tasks and activities, distraction by extraneous stimuli, failure to pay attention to details and making careless mistakes, difficulty in developing, maintaining, and understanding relationships, and abnormal highly restricted, fixated interests. (*Id.*).

Starting in April 2019, Mr. Aubin attended biweekly supported employment sessions with Beacon Health providers. (Tr. 609-10). Notes from April 29, 2019 indicated Mr. Aubin would like to maintain a routine and structured work environment with supportive managers. (Tr. 615). He felt he would need a job located close to home or on a bus route; he had his driver's permit, but his parents helped to transport him (his mother attended this appointment with him). (*Id.*). Mr. Aubin was working part-time, in four-hour shifts. (*Id.*). Mr. Aubin felt his right sided paralysis and symptoms of pain would increase if he attempted a seven-hour workday. (*Id.*). Mr. Aubin was close to graduating Lakeland Community College with a general arts degree; he needed one more class to graduate. (*Id.*).

On April 18, 2019, at age 25, Mr. Aubin transferred treatment from Dr. Eden to Dr. Schenkelberg; he attended the first appointment with Dr. Schenkelberg along with his mother. (Tr. 593, 596). When Mr. Aubin is not taking his prescribed stimulants, he "has difficulty even completing a single task, is easily distracted, and struggles with both hyperactivity and impulsivity." (Tr. 596). Mr. Aubin reported he takes Lexapro to control his symptoms of anxiety and irritability. (*Id.*). Mr. Aubin becomes anxious when his schedule or routine is disrupted, or when he has restrictions placed on him. (*Id.*). Temper issues can occur when Mr. Aubin becomes anxious, including clenching his fists and physical aggression against his mother. (*Id.*). Dr. Schenkelberg noted Mr. Aubin had a hemiparetic gait, right sided weakness, and increased tone. (Tr. 597). Dr. Schenkelberg diagnosed Mr. Aubin with ADHD, autism spectrum disorder, and unspecified anxiety disorder. (Tr. 598).

Mr. Aubin attended therapy and community services sessions with Beacon Health clinicians starting in April 2019. (Tr. 611-13, 625-32). Notes indicate Mr. Aubin was working to

learn anger management skills and coping mechanisms to control the frequency and intensity of his emotional outbursts. (*Id.*). Mr. Aubin was receptive to the clinician's suggestions and at times reported fewer anger and emotional outbursts. (Tr. 612-13, 625-26). However, Mr. Aubin also reported experiencing anxiety and anger-provoking incidents at work. (Tr. 631).

On May 14, 2019, Dr. Schenkelberg completed a mental impairment questionnaire and a physical medical source statement. (Tr. 511-16). Dr. Schenkelberg noted Mr. Aubin's symptoms included weakness, fatigue, inattention, hyperactivity, impulsivity, anger, anxiety, and poor socialization. (Tr. 513). Mr. Aubin also is limited by impaired depth perception, extreme heat (which causes vomiting), and sensory sensitivities. (Tr. 516). Dr. Schenkelberg opined Mr. Aubin can sit for two hours and stand/walk about four hours in an eight-hour workday. (Tr. 514). Due to his muscle weakness, Mr. Aubin will need four unscheduled breaks during the work day, with each lasting five to ten minutes. (*Id.*). But Mr. Aubin would not require absences from work as a result of his impairments. (Tr. 516).  Mr. Aubin can occasionally lift and carry ten pounds, rarely lift and carry twenty pounds. (Tr. 515).

Dr. Schenkelberg indicated that Mr. Aubin was limited, but satisfactory, in his ability to manage his attendance and be punctual, and in his ability to be aware of normal hazards and take appropriate precautions. (Tr. 511-512). Dr. Schenkelberg indicated Mr. Aubin was either "seriously limited, but not precluded," "unable to meet competitive standards," or somewhere between those two for all other areas of functioning in work-related activities, such as carrying out, understanding, and remembering instructions, maintaining attention and concentration, completing a normal workday without interruptions, asking questions or requesting assistance, maintaining socially appropriate behavior, responding appropriately to changes in the work

setting, and setting realistic goals or making plans independently of others. (*Id.*). Dr. Schenkelberg opined Mr. Aubin will likely be off-task 25% or more of the workday due to his symptoms interfering with his attention and concentration. (*Id.*). However, Dr. Schenkelberg indicated Mr. Aubin was capable of low-stress work. (Tr. 516).

**Dr. Donca.** Mihaela Donca, M.D., has been treating Mr. Aubin for his ADHD, cerebral palsy, and autism spectrum disorder ("ASD") since 2015. (Tr. 393, 518).

On May 19, 2019, Dr. Donca completed a medical source statement. (Tr. 518-21). Dr. Donca listed Mr. Aubin's symptoms as fatigue, leg weakness, occasional back pain, anxiety, attention deficit, and difficulty walking. (Tr. 518). She described Mr. Aubin as having spasticity in both legs, causing a spastic gait, and foot deformities. (*Id.*). Dr. Donca opined Mr. Aubin can sit for two hours in an eight-hour day, and stand/walk for four hours in an eight-hour day. (Tr. 519). Due to his muscle weakness, he will require four additional unscheduled breaks of five to ten minutes during each working day, but would not need additional absences during the month. (Tr. 519, 521). Mr. Aubin can occasionally lift and carry ten pounds, rarely lift and carry twenty pounds. (Tr. 520).

Dr. Donca opined Mr. Aubin would be off-task 25% or more of the workday due to his symptoms interfering with his attention and concentration. (*Id.*). Dr. Donca indicated Mr. Aubin was capable of low stress work. (Tr. 521). Dr. Donca indicated Mr. Aubin has additional limitations of impaired depth perception, extreme heat causes vomiting, and extreme noise overwhelms his senses. (*Id.*).

**Dr. Bradford.** On August 17, 2018, Mr. Aubin underwent a consultative physical examination by Dorothy Bradford, M.D.. (Tr. 504-10). Dr. Bradford indicated Mr. Aubin

exhibited generally normal muscle strength and range of motion. (Tr. 504-07, 509). Dr. Bradford noted muscle atrophy was not present, but also provided circumferential measurements indicating Mr. Aubin's right thigh and calf were smaller than his left. (Tr. 505). Mr. Aubin also exhibited significantly decreased range of motion in his right ankle of five to ten degrees (the form indicated normal range of motion is between 20 to 40 degrees depending on the movement). (Tr. 507). Dr. Bradford concluded Mr. Aubin has mild cerebral palsy, mainly affecting his right leg, with a diplegic gait. (Tr. 510). In Dr. Bradford's opinion, Mr. Aubin could "perform light sedentary activity." (*Id.*).

**State Agency Medical Consultants.** In March 2018, Diane Manos, M.D., and Irma Johnston, Psy.D., reviewed Mr. Aubin's child disability claim at the initial level. (Tr. 69-75). Dr. Manos reviewed the medical evidence and noted Mr. Aubin's history and diagnosis of cerebral palsy, but stated, "there is not sufficient evidence for the entire timeframe . . . to determine conditions, severity, and overall Fx [function]." (Tr. 69). Dr. Johnston provided a mental functional capacity assessment indicating Mr. Aubin "is able to concentrate and persist to do simple, short-cycle work consisting of 1-3 steps, in a setting without demand for fast pace or high production" and "able to adapt to occasional changes in a routine setting." (Tr. 73). Mr. Aubin was determined not disabled with the statement that Mr. Aubin was "able to do simple, routine work in a setting that did not require a lot of interaction with others. Since there is insufficient evidence prior to age 22, your claim is denied." (Tr. 74-75).

Mr. Aubin's child disability claim was reviewed at the reconsideration level by Cindy Matyi, Ph.D., and Leslie Green, M.D., in August 2018. (Tr. 85, 88). Dr. Matyi affirmed Dr. Johnston's findings. (Tr. 89-91). Dr. Green assessed Mr. Aubin as able to stand for four hours and sit for six

hours in an eight-hour workday, but he could not work foot controls due to his cerebral palsy and diplegic gait. (Tr. 87). Dr. Green restricted Mr. Aubin to lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds frequently. (*Id.*). Dr. Green also limited Mr. Aubin to no protected heights, hazards, or commercial driving. (Tr. 88). Mr. Aubin was determined not disabled and able to perform sedentary work; the examiners again explained that his claim was denied due to insufficient evidence prior to age 22. (Tr. 92-93). Drs. Matyi and Green also reviewed Mr. Aubin's SSI application at the reconsideration level and provided the same assessment, finding Mr. Aubin able to perform work at a sedentary level with restrictions. (Tr. 101-10).

### THE ALJ'S DECISION

The ALJ's decision, dated July 18, 2019, included the following findings of facts and conclusions of law:

1. Born on October 23, 1993, the claimant attained age 22 on October 22, 2015 (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2. The claimant has not engaged in substantial gainful activity since October 23, 1993, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: cerebral palsy, autism spectrum disorder, attention deficit hyperactivity disorder (ADHD) and bilateral pes planus (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except: he can never claim ladders, ropes or scaffolds; can never crawl; can occasionally climb ramps and stairs; can occasionally balance,

stoop and kneel; he should avoid exposure to hazards (heights, machinery, commercial driving); and mentally, he can perform routine tasks in a low stress environment (no fast pace, strict quotas or frequent duty changes) involving superficial interpersonal interactions with coworkers and supervisors (no arbitration, negotiation or confrontation), and no interaction with the general public as a job requirement (20 CFR 404.1569a and 416.969a).

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 23, 1993 and is now 25 years old, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 23, 1993, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g)).

(Tr. 17-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

16

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). Disabled child insurance benefits are available if the claimant is 18 years old or older and has a disability that began before attaining age 22. 20 C.F.R. § 404.350(a)(5)).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity ("RFC") to perform available

18

work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past

work experience to determine if the claimant could perform other work. *Id.* Only if a claimant

satisfies each element of the analysis, including inability to do other work, and meets the duration

requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see*

*also Walters*, 127 F.3d at 529.

### DISCUSSION

Mr. Aubin raises two errors on appeal: the ALJ did not properly evaluate the medical

opinion evidence consistent with Agency authority and Sixth Circuit precedent; and the ALJ erred

at Step Five by relying on jobs identified by the VE at the hearing without resolving a conflict in

the vocational evidence. (Pl.'s Br., ECF #14, PageID 704). The Commissioner responds that

substantial evidence supports the ALJ's RFC finding, and that substantial evidence supports the

ALJ's Step Five finding. (Comm'r's Br., ECF #19, PageID 754-65). For the reasons that follow, I

find Mr. Aubin's case warrants remand because the ALJ's RFC finding was not supported by

substantial evidence. However, I find no error with the ALJ's reliance on the VE's testimony at the

hearing.

**I.      The ALJ's RFC finding was not supported by substantial evidence.**

Mr. Aubin raises error with the ALJ's handling of the medical opinion evidence, asserting

the ALJ did not sufficiently explain his evaluation of the medical evidence or weighing of opinion

evidence, and selectively used Mr. Aubin's subjective evidence and activities of daily living to reject

objective medical evidence. (Pl.'s Br., ECF #14, PageID 723-28). As a result of these errors, Mr.

Aubin asserts the RFC does not accurately describe his impairments or his ability to work; as such,

the RFC cannot be substantial evidence to support the ALJ's decision denying Mr. Aubin benefits.

19

(*Id.* at PageID 723).In response, the Commissioner asserts the ALJ met the substantial evidence standard, reiterating evidence cited by the ALJ describing Mr. Aubin's medical history from childhood through 2018 and asserting an ALJ may consider a claimant's activities of daily living when assessing a claimant's RFC. (Comm'r's Br., ECF #19, PageID 754-60).

I agree with Mr. Aubin. Having read the ALJ's decision "as a whole and with common sense," *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (6th Cir. 2010), I conclude the ALJ did not meet the substantial evidence standard because he did not "take into account whatever in the record fairly detracts from its weight." *Brooks*, 531 F. App'x at 641.

For claims filed on or after March 27, 2017, Social Security regulations specify that the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b), 416.920c(b). The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, and is not required to give a treating source controlling weight. *Id.* at §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[5] and consistency.[6] *Id.* at §§ 404.1520c(b), 416.920c(b). The regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one

---

[5]     "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[6]     "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2) & 416.913(a)(2).

An ALJ is no longer bound by the "treating physician rule," and is not required to find a medical source opinion persuasive. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). Rather, an ALJ must only explain how the factors of supportability and consistency were considered, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors.[7] *Id.*; *see also* 20 C.F.R. §§ 404.1520c(b)(2) & 416.920c(b)(2).

The determination of an individual's RFC is an issue reserved for the Commissioner. 20 C.F.R. §§ 404.1527(d) & 416.927(d). Even so, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010). And while the ALJ is not required to find a treating physician's opinion

---

[7]     Mr. Aubin argues the ALJ found the medical opinions of Drs. Schenkelberg and Donca equally persuasive and his failure to provide the second step of his analysis as found in 20 C.F.R. §§ 404.1520c(b)(3) and 416.920c(b)(3) precludes meaningful review. (Pl.'s Br., ECF #14, PageID 725-26). Critically, however, the ALJ found both of these opinions *unpersuasive* and rejected them as "not supported by or consistent with the objective findings." (Tr. 26). The regulations state if the ALJ finds "two or more medical opinions or prior administrative medical findings on the same issue are both *equally well-supported* . . . and *consistent with the record* . . . but are not exactly the same, [the ALJ] will articulate how [he] considered the other most persuasive factors [of relationship with the claimant, specialization, and other factors]." 20 C.F.R. §§ 404.1520c(b)(3), (c) & 416.920c(b)(3), (c) (emphasis added). Because the ALJ rejected the medical opinions of Drs. Schenkelberg and Donca as not supported by or consistent with the record, I find no error prevents my meaningful review.

21

persuasive, the ALJ is required to provide *justifiable* reasons for rejecting the opinion. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009).

Social security proceedings are "informal" and "nonadversarial." *Carr v. Saul*, 141 S. Ct. 1352, 1359 (2021). As such, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Id.* (quoting *Sims v. Apfel*, 530 U.S. 103, 103-04 (2000)). Evaluating an ALJ's decision under the substantial evidence standard "does not permit a selective reading of the record. . . . Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks*, 531 F. App'x at 641. And even if there "is enough evidence in the record to support the decision," substantial evidence requires the ALJ to provide reasoning sufficient to "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

Here, the ALJ cited to 20 C.F.R. §§ 404.1520c and 416.920c and explained he "reject[ed] the medical opinions found at Exhibits 8F, 9F, and 10F [provided by Drs. Schenkelberg and Donca] because the limitations are not supported by or consistent with the objective findings." (Tr. 26). The ALJ then recited a number of *subjective* activities to support this finding: "[t]he claimant can prepare meals, pay bills, take public transportation, shop, drive, read, play games, spend time with others, deal appropriately with authority, live with others, watch TV, use the internet, handle self-care and personal hygiene, care for pets, attend college classes and work part-time." (*Id.*).

Elsewhere in the decision, the ALJ again uses Mr. Aubin's subjective statements and activities of daily living to support his RFC finding: "[t]he undersigned found the non-exertional limitations [opined by the State Agency medical consultants] persuasive because they are consistent with the preponderance of the evidence and with the claimant's statements and his activities of

22

daily living." (Tr. 26). This recitation states these opinions are consistent with the evidence but again does not cite to the record to show objective medical findings supporting this conclusion.

Moreover, the ALJ's decision repeatedly alluded to Mr. Aubin's ability to work at a sedentary exertional level, but did not fully address the reasoning for Mr. Aubin's non-exertional restrictions due to the co-occurring diagnoses of cerebral palsy, autism, or ADHD:

- "The evidence as a whole supports a sedentary exertional level with additional exertional, postural and manipulative restrictions as outlined in Finding No. 5 above." (Tr. 25).

- "In support of his assertion that the claimant struggles with daily activities, the claimant has submitted a statement from his mother. While this statement, in combination, support[s] the claimant's assertions, that he struggles to perform less than sedentary activities of daily living, the medical record does not support the totality of the statement." (Tr. 26) (internal citations omitted).

- "No treating source refers to the claimant has having incapacitating or debilitating symptoms that would prevent him from returning to the workplace at a reduced level of exertion such as in the performance of sedentary work, or has otherwise described the claimant as 'totally and permanently disabled' by his impairments and complaints. In summary, the evidence does not corroborate the claimant's allegations of symptoms attributed to his impairments to an extent that would preclude the performance of sedentary work with the restrictions stated above." (*Id.*).

The Commissioner is correct that an ALJ may consider a claimant's activities of daily living and compare that against the medical evidence when assessing a claimant's RFC. *Doornbos v. Comm'r of Soc. Sec.*, No. 17-1464, 2017 WL 8948744, at *4 (6th Cir. Dec. 13, 2017); *see also* SSR 85-16. However, Agency regulations make clear that forming an RFC for an individual with a mental impairment requires an ALJ to fully evaluate a claimant's ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting. SSR 85-16. And such evaluation includes the quality of daily activities and the claimant's ability to sustain those activities, interests, and relate to others

*over a period of time*. *Id.* (emphasis in original). Moreover, the ALJ is also directed to consider the "frequency, appropriateness, and independence of the activities." *Id.*

The ALJ's reliance on Mr. Aubin's activities of daily living, his ability to work part-time as a maintenance worker, his ability to drive with a learner's permit, and his attendance at community college is misplaced and does not comport with the requirements set forth in SSR 85-16. The record demonstrates Mr. Aubin was 25 years old at the time of the hearing and had taken seven years' worth of community college courses without completing his Associate of Arts degree, even though he had special accommodations in many classes (and the only reason he did not have those accommodations in all classes was because he did not request them). (Tr. 47-49). It took him three years of his two-year degree to "really understand what it is to be a college student." (Tr. 46). Even as an adult, Mr. Aubin often attended his appointments with his mother, who assists in clarifying Mr. Aubin's speech. (Tr. 592-93, 601, 603-04, 614). Mr. Aubin had his learner's permit for two years, but could not drive alone and would run off the road. (Tr. 41-42). He requires his parents to help transport him. (Tr. 615). Mr. Aubin attended supported employment sessions with his mental health providers. (Tr. 615, 618). Mr. Aubin received additional assistance at his part-time job, beyond that provided to other employees. (Tr. 45). Even so, he sometimes needed to redo his work because he doesn't "really see the whole picture of cleaning." (*Id.*). Because of the anxiety Mr. Aubin experiences due in part to his mental impairments, Mr. Aubin has "angry outbursts" and becomes violent; these outbursts can be directed at his mother and also occur at work. (Tr. 611-13, 625-26).

The ALJ's failure to assess the quality and independence of Mr. Aubin's activities does not provide the substantial evidence necessary to support the ALJ's RFC. I therefore remand and

direct the ALJ to reevaluate the RFC findings, fully assessing Mr. Aubin's exertional and non-exertional abilities in light of agency regulations, up to and including the gathering of opinion evidence regarding Mr. Aubin's co-occurring diagnoses of cerebral palsy, autism spectrum disorder, and ADHD.

## II.    The ALJ did not err when relying on VE hearing testimony in support of his Step Five findings.

Mr. Aubin alleges the ALJ erred by not meaningfully addressing the post-hearing rebuttal evidence provided in VE Heckman's report. (Pl.'s Br., ECF # 14, PageID 717-23). In support, Mr. Aubin presents a procedural due process argument, claiming he has the constitutional and statutory right to challenge contrary evidence, and a merits objection to the ALJ's ultimate finding of disability based on VE Nimberger's testimony. (*Id.*). The Commissioner rebuts these allegations, identifying no direct conflict between the DOT and VE Nimberger's testimony that would require the ALJ to resolve or discuss the purported conflict raised by VE Heckman's report. (Comm'r's Br., ECF #19, PageID 760-65). For the reasons described below, I find Mr. Aubin's argument unavailing.

The Commissioner bears the burden at Step Five to show a claimant has the residual functional capacity to perform available work in the national economy. *Walters,* 127 F.3d at 529. A VE's testimony may provide substantial evidence that an individual has the vocational qualifications to perform specific jobs, but only if the hypothetical question accurately portrays the individual's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 516 (6th Cir. 2010). The Commissioner takes "administrative notice of 'reliable job information' available from various publications, including the [DOT]." *Zimmerman v. Comm'r of Soc. Sec.,* No. 1:18-cv-1233, 2019 WL 4736267, at *8 (N.D. Ohio, Sept. 27, 2019) (quoting Soc. Sec. Ruling 00-4p).

Before an ALJ may rely on evidence from a VE to support a disability determination, the ALJ must inquire on the record whether there are any conflicts between occupational evidence the VE provided and information contained in the DOT. SSR 00-4p.

But the ALJ is "under no duty to conduct an independent investigation into the vocational expert's testimony to determine whether it was correct." *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 318 (6th Cir. 2020) (internal quotations omitted). Rather, "this obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT." *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009). "All that is required before an ALJ can rely on vocational evidence provided by a vocational expert is that the ALJ either ensure that the evidence does not conflict with the information in the DOT or obtain a reasonable explanation for any conflict." *O'Neal*, 799 F. App'x  at 318; *see also* SSR 00-4p.

The failure of a claimant's counsel to object at the hearing does not provide grounds for relief. *Beinlich*, 345 F. App'x at 168-69. And while an ALJ must consider all of the evidence in a claimant's case record, 40 U.S.C. § 423(d)(5)(B), an ALJ has no obligation to explicitly address a claimant's post-hearing objections to VE testimony. *Zimmerman v. Comm'r of Soc. Sec.*, No. 1:18CV1233, 2019 WL 4736267, at *9 (N.D. Ohio Sept. 27, 2019) (collecting cases).

Here, VE Nimberger identified job titles in the DOT that comported with the hypothetical posed by the ALJ. (Tr. 54-56). VE Nimberger acknowledged that the DOT was outdated in some respects ("they're not addressing envelopes anymore like they did decades ago") but provided a basis and rational opinion for the job numbers quoted. (Tr. 55) (describing his experience and comparing job numbers found in Employment Quarterly and Job Browser Pro to find 10,000 addresser jobs in the national economy). VE Nimberger also described where he narrowed the

field with respect to the "legion" numbers of table workers in the DOT. (Tr. 56). Mr. Aubin's counsel cross-examined VE Nimberger, who again referenced his experience when describing the hypothetical individual as "extremely limited." (Tr. 58).

Despite having the opportunity, Mr. Aubin's counsel did not object to VE Nimberger's testimony at the hearing. (*See* Tr. 58-62). Rather, his counsel waited until after the hearing to object to the testimony as "surprise testimony" and presented rebuttal evidence by way of a letter from VE Heckman. (Tr. 371-81). In the decision, the ALJ considered this post-hearing brief, stating as follows:

> Claimant's counsel submitted a post-hearing brief (Exhibits 20E, 21E, and 22E) that the social interaction requirements of the above jobs during the training period precluded the ability to perform the jobs in question. All three of these jobs had significant social functioning requirements far in excess of the hypothetical, even after training. Additionally, all three jobs are additionally not entirely appropriate based upon strength and skill requirements of the jobs.

> The undersigned overruled the objections based upon 20 CFR § 404.1566(d) which allows an Administrative Law Judge to take administrative notice of reliable job information available from various governmental and other publications. Specific examples include the Dictionary of Occupational Titles published by the Department of Labor, County Business Patterns and Census Reports published by the Bureau of the Census, and Occupational Outlook Handbook published by the Bureau of Labor Statistics. Thus, vocational expert testimony is not necessary on this issue. It is the purview of the Administrative Law Judge to determine whether jobs exist in significant numbers. The claimant's objection to the vocational expert's testimony is therefore overruled.

(Tr. 28). Although the ALJ's use of the phrase "vocational expert testimony is not necessary" is unfortunate, it is clear the ALJ actually considered Mr. Aubin's the post-hearing brief, but chose to rely on VE Nimberger's testimony instead, and explained his reasons for relying on that evidence. (Tr. 27-28). The regulations do not require more.

Consistent with substantial evidence review, I may not substitute my judgment to overrule the ALJ to determine which VE's testimony appears more credible. *Luna v. Comm'r of Soc. Sec.*, No. 1:19-1414, 2020 WL 5549318, *17 (N.D. Ohio Aug. 28, 2020), *report and recommendation adopted*, 2020 WL 5544379 (N.D. Ohio Sept. 15, 2020). And, despite Mr. Aubin's exhortation to the contrary (Pl.'s Br., ECF #14, PageID 722), I find his argument asks me to reweigh the evidence, which I am not permitted to do.

I find no error with the ALJ's reliance on VE Nimberger's testimony at Step Five.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying SSI and child disability benefits not supported by substantial evidence. I therefore **AFFIRM** in part and **REVERSE** in part the decision of the Commissioner, and **REMAND** this matter for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: January 14, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE